**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

---

| | |
|---|---|
| ROCHE DIAGNOSTICS OPERATIONS, INC., and CORANGE INTERNATIONAL LIMITED, | ) ) ) |
| Plaintiffs, | ) ) ) C.A. No. 07-753 JJF |
| v. | ) ) ) |
| ABBOTT DIABETES CARE, INCORPORATED, and ABBOTT DIABETES CARE SALES CORPORATION, et al. | ) ) ) DEMAND FOR JURY TRIAL ) ) |
| Defendants. | ) ) |

---

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT
NOVA TO PLAINTIFFS' AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Nova Biomedical Corporation ("Nova"), by its undersigned attorneys,

based upon its own knowledge, and otherwise upon information and belief, responds to

Plaintiffs' Amended Complaint For Patent Infringement ("Amended Complaint") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Nova admits that the Amended Complaint purports to state causes of

action under the patent laws of the United States, Title 35 of the United States Code.  Nova

denies the remaining allegations contained in Paragraph 1.

2.      Nova admits, upon information and belief, that RDOI is a corporation

organized and existing under the laws of the State of Delaware, with a principal place of business

at 9115 Hague Road, Indianapolis, IN 46250.  Nova denies the remaining allegations contained

in Paragraph 2.

3.      Nova admits, upon information and belief, that Corange is a limited

liability company organized and existing under the laws of Bermuda, with a principal place of

business at 22 Church Street, P.O. Box HM 2026, Hamilton HM HX Bermuda.  Nova denies the remaining allegations contained in Paragraph 3.

4.    Nova admits, upon information and belief, that Defendant ADC is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 1360 South Loop Road, Alameda, CA 94502.

5.    Nova admits, upon information and belief, that Defendant ADCS is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 1360 South Loop Road, Alameda, CA 94502.

6.    Nova admits, upon information and belief, that Defendant Bayer is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 555 White Plains Road, Tarrytown, NY 10591.

7.    Nova admits, upon information and belief, that Defendant DDI is a corporation organized and existing under the laws of the State of North Carolina, with a principal place of business at 9300 Harris Corners Pkwy, Suite 450, Charlotte, NC 28269.

8.    Nova admits, upon information and belief, that Defendant LifeScan is a corporation organized and existing under the laws of the State of California, with a principal place of business at 1000 Gibraltar Drive, Milpitas, CA 95035.

9.    Admitted.

10.    Nova admits that this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

11.    Nova lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 11, and therefore denies same.

12.     Nova lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 12, and therefore denies same.

13.     Nova lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 13, and therefore denies same.

14.     Nova lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 14, and therefore denies same.

15.     Nova admits that it conducts business within this District.  Nova denies that it has committed acts of patent infringement in the United States and denies the remaining allegations of Paragraph 15.

16.     Nova admits that venue is proper in this District under 28 U.S.C. § 1400(b) and § 1391(b) and (c).

**CLAIM FOR RELIEF**

17.     Nova admits that, on its face, United States Patent No. 7,276,146 ("the '146 patent") is entitled "Electrodes, Methods, Apparatuses Comprising Micro-Electrode Arrays" and Roche Diagnostics Operations, Inc. and Corange International Limited are listed as Assignees, and that it issued on October 2, 2007.  Nova further admits that a copy of the '146 patent is attached to the Amended Complaint as Exhibit A.  Nova denies the remaining allegations of Paragraph 17.

18.     Nova admits that, on its face, United States Patent No. 7,276,147 ("the '147 patent") is entitled "Methods For Determining The Concentration Of An Analyte In A Liquid Sample Using Small Volume Liquid Samples And Fast Test Times" and Roche Diagnostics Operations, Inc. and Corange International Limited are listed as Assignees, and that

it issued on October 2, 2007. Nova further admits that a copy of the '147 patent is attached to the Amended Complaint as Exhibit B. Nova denies the remaining allegations of Paragraph 18.

19.    As to Nova, Nova denies the allegations contained in Paragraph 19. Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 as applied to the other named defendants.

## COUNT I

20.    Nova incorporates Paragraphs 1-19 of its Answer as if set forth fully herein.

21.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21, and therefore denies same.

22.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22, and therefore denies same.

23.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23, and therefore denies same.

## COUNT II

24.    Nova incorporates Paragraphs 1-19 of its Answer as if set forth fully herein.

25.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25, and therefore denies same.

26.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26, and therefore denies same.

27.    Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27, and therefore denies same.

## COUNT III

28.　　Nova incorporates Paragraphs 1-19 of its Answer as if set forth fully herein.

29.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29, and therefore denies same.

30.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30, and therefore denies same.

31.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31, and therefore denies same.

## COUNT IV

32.　　Nova incorporates Paragraphs 1-19 of its Answer as if set forth fully herein.

33.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33, and therefore denies same.

34.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34, and therefore denies same.

35.　　Nova lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35, and therefore denies same.

## COUNT V

36.　　Nova incorporates Paragraphs 1-19 of its Answer as if set forth fully herein.

37.　　Nova denies the allegations contained in Paragraph 37.

38.　　Nova denies the allegations contained in Paragraph 38.

39.    Nova denies the allegations contained in Paragraph 39.

40.    Nova denies the allegations contained in Paragraph 40.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

41.    Nova is not infringing and has not infringed, either directly or by inducing or contributing to infringement by others, any valid claim of the '146 patent or the '147 patent.

### Second Affirmative Defense

42.    The claims of the '146 patent and the '147 patent are invalid for failure to comply with the conditions for patentability specified in 35 U.S.C. § 101, *et seq.*, including, but not limited to, the requirements in 35 U.S.C. §§ 102, 103 and 112.

### Third Affirmative Defense

43.    Roche Diagnostics Operations, Inc. and Corange International Limited (collectively, "Roche") are estopped from construing the claims of the '146 patent and the '147 patent in such a way as to cover any of Nova's products or activities by reasons of statements made to the United States Patent and Trademark Office ("USPTO") during the prosecution of the applications that resulted in those patents.

### Fourth Affirmative Defense

44.    Roche's claims against Nova are barred, in whole or in part, by the doctrines of waiver, estoppel, unclean hands, forfeiture and/or acquiescence.

### Fifth Affirmative Defense

45.    Defendants are not properly joined together under FED. R. CIV. P. 20 because the relief sought by Roche from each defendant is not in respect of, or arising out of, the same transaction, occurrence, or series of transactions or occurrences.

6

**Sixth Affirmative Defense**

46.    The '146 and '147 patents, and all of their claims, are unenforceable because they were obtained through the failure of the inventor, and/or his agents, to discharge their duty of candor and good faith during prosecution of the patents-in-suit, in violation of 37 C.F.R. § 1.56.

47.    During the prosecution of the '146 patent, the inventor and his agents breached their duty of candor and good faith with respect to Japanese Patent 1999-94790 ("the Goto Reference"), when the Examiner erroneously allowed the inventor to swear behind the Goto Reference with an inventor declaration. The Goto Reference was published on April 9, 1999, more than one year prior to the earliest claimed priority date of the '146 patent, November 16, 2001. Consequently, the Goto Reference qualifies as prior art under 35 U.S.C. § 102(b), which cannot be avoided by showing an earlier invention date. The inventor disclosed the Goto Reference to the Patent Office in the Information Disclosure Statement, filed May 4, 2006. The Goto Reference is material prior art to the methods claimed in the '146 patent, including the claimed blood volume of the capillary chamber of the test strip and the claimed time for determining blood glucose concentration. Roche admitted that the Goto Reference disclosed blood volumes and times for determining blood glucose concentration that would come within the claims of the '146 patent when Roche submitted the Goto Reference as prior art to the European Patent Office in its May 16, 2006 Opposition against European Patent No. 1,269,173 ("the Roche EP Opposition Proceeding"). The inventor and his agents actually stopped the United States Patent Office from issuing the '146 patent to provide the record from the Roche EP Opposition Proceeding to the Examiner, including Roche's admissions. On December 22, 2006, the inventor submitted a declaration under Rule 131 attesting to the conception and reduction to practice of the claimed methods as early as March 1998. On that basis, the Examiner concluded,

in a Notice of Allowability on July 31, 2007, that the Goto Reference did not qualify as prior art. On information and belief, the inventor and his agents knew that the Goto Reference qualified as prior art under 35 U.S.C. § 102(b), and knew that the Examiner had erred in allowing the reference to be sworn behind.   Nonetheless, the inventor and his agents did not correct the Examiner's error.   Consequently, the Examiner never considered the Goto Reference or the Roche admissions regarding the Goto Reference.

48.    During the prosecution of the '147 patent, the inventor and his agents breached their duty of candor and good faith with respect to the Goto Reference, when the Examiner erroneously allowed the inventor to swear behind the Goto Reference with an inventor declaration.  The Goto Reference was published on April 9, 1999, more than one year prior to the earliest claimed priority date of the '147 patent, November 16, 2001.  Consequently, the Goto Reference qualifies as prior art under 35 U.S.C. § 102(b), which cannot be avoided by showing an earlier invention date.  The inventor disclosed the Goto Reference to the Patent Office in his Information Disclosure Statement, filed June 20, 2006.  The Goto Reference is material prior art to the methods claimed in the '147 patent, including the claimed blood volume of the capillary chamber of the test strip and the claimed time for determining blood glucose concentration. Roche admitted that the Goto Reference disclosed blood volumes and times for determining blood glucose concentration that would come within the claims of the '147 patent when Roche submitted the Goto Reference as prior art to the European Patent Office in its May 16, 2006 Opposition against European Patent No. 1,269,173.  The inventor and his agents actually stopped the United States Patent Office from issuing the '147 patent to provide the record from the Roche EP Opposition Proceeding to the Examiner, including Roche's admissions.   When the application for the '147 patent was filed on March 5, 2003, the inventor submitted a declaration

under Rule 131 attesting to the conception and reduction to practice of the claimed methods as early as March 1998.  On that basis, the Examiner concluded, in a Notice of Allowability on July 31, 2007, that the Goto Reference did not qualify as prior art.  On information and belief, the inventor and his agents knew that the Goto Reference qualified as prior art under 35 U.S.C. § 102(b), and knew that the Examiner had erred in allowing the reference to be sworn behind. Nonetheless, the inventor and his agents did not correct the Examiner's error.  Consequently, the Examiner never considered the Goto Reference or the Roche admissions regarding the Goto Reference.

49.    The omitted information described in Paragraphs 46 and 47 would have been considered by a reasonable examiner to be material to a determination of the allowability of the patent claims, and on information and belief, said omissions were made with intent to deceive the Patent Office.  Had the inventor and/or his agents disclosed the pertinent information to the Patent Office, the '146 and '147 patents would not have issued.  Hence, the patents-in-suit are unenforceable for inequitable conduct.

## COUNTERCLAIMS

### THE PARTIES

1.    Nova is a Massachusetts company having a principal place of business at 200 Prospect Street, Waltham, MA.

2.    Upon information and belief, RDOI is a Delaware corporation, with a principal place of business at 9115 Hague Road, Indianapolis, IN 46250.

3.    Upon information and belief, Corange is a limited liability company organized and existing under the laws of Bermuda, with a principal place of business at 22 Church Street, P.O. Box HM 2026, Hamilton HM HX Bermuda.

## JURISDICTION AND VENUE

4.     Nova's First, Second and Third counterclaims arise under the patent laws of the United States, Title 35, United States Code.  This Court has jurisdiction over the subject matter of these Counterclaims under 28 U.S.C. §§ 1331, 1338, 2201 and 2202.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b).

5.     This Court has jurisdiction over the subject matter of Nova's Fourth, Fifth, Sixth and Seventh Counterclaims under 28 U.S.C. §§ 1332(a), 1332(c) and 1367(a).  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1391(c).

## FACTUAL ALLEGATIONS

6.     On information and belief, F. Hoffman-La Roche, Ltd. ("HLR") is a limited liability company organized and existing under the laws of Switzerland, with a principal place of business at Grenzacherstrasse 124, CH-4070 Basel, Switzerland.

7.     On information and belief, Plaintiff RDOI is a subsidiary of, or otherwise related to, HLR.

8.     On information and belief, Dr. Werner Schaefer was President of the Roche Laboratory Systems business unit of HLR during the time period of the events set forth below.

9.     On information and belief, Dr. Gerd Grenner is Chief Technology Officer of the Roche Diagnostics business unit of HLR.

10.    On information and belief, from a time no later than 1995, Roche had intimate knowledge of Nova and its various technologies.  In particular, in 1999, Roche expressed an interest in learning about Nova's glucose strip technology.

11.     On September 8, 1999, Drs. Schaefer and Grenner met with Nova to discuss, *inter alia*, Nova's glucose strip technology.

12.     On information and belief, HLR attended this meeting for the purposes of evaluating a potential business relationship whereby HLR would be entitled to distribute and sell blood glucose monitoring strips developed by Nova.

13.     On September 8, 1999, HLR and Nova entered into a confidentiality agreement (the "Agreement") governing Nova's disclosure of proprietary information relating to its "new glucose monitoring technology" (the "Information"). A true and correct copy of the executed Agreement is attached hereto as Exhibit A.

14.     Paragraph 3 of the Agreement provides that "Affiliated companies of ROCHE as well as consultants of ROCHE are not considered third parties in the meaning of Art. 3, provided they assume the same secrecy obligations and are therefore bound by the secrecy obligations of ROCHE." Exhibit A, ¶ 3.

15.     On information and belief, Plaintiff RDOI is bound by the terms of the Agreement by virtue of its affiliation with HLR.

16.     The Agreement required HLR, *inter alia*, to "treat such Information for a period of five (5) years after execution of this Agreement in the same manner as it would treat its own proprietary information and will not divulge the Information to third parties or use any Information for any other purposes than its evaluation." Exhibit A, ¶ 3.

17.     At least during the September 8, 1999 meeting, and subject to the Agreement, Nova provided HLR through the disclosures to Drs. Schaefer and Grenner with Information concerning Nova's glucose strip technology, including, *inter alia*, a product demonstration, a description of the manufacturing process, the product specifications, the design

of the product, including the component parts and layers, and other confidential and proprietary Information concerning Nova's work on a sub-microliter glucose strip.

18.     Nova also provided Roche with additional confidential and proprietary Information concerning Nova's development of a blood glucose monitoring strip, including unpublished copies of two then-pending Nova patent applications.

19.     On information and belief, Roche and Roche's legal counsel conducted a comprehensive study of Nova's then unpublished patent applications.

20.     On July 10, 2001, United States Patent No. 6,258,229 ("the '229 Patent") was duly and legally issued, entitled "Disposable Sub-Microliter Volume Sensor And Method Of Making," with named inventors Handani Winarta, Xiaohua Cai, Fung Seto and Chung Chang Young.  Nova is the owner of all right, title and interest in and to the '229 Patent.  A true and correct copy of the '229 Patent is attached hereto as Exhibit B.

21.     One of the two patent applications referred to in Paragraphs 18-19 resulted in the issuance of the '229 Patent.

22.     On information and belief, Roche improperly used Nova's confidential and proprietary Information, provided under the Agreement, to develop Roche's own blood glucose monitoring strips.

## FIRST COUNTERCLAIM

### Declaratory Relief Regarding Non-Infringement

23.     Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

24.     Nova is not infringing and has not infringed, either directly or by inducing or contributing to infringement by others, any valid claim of the '146 or '147 patents.

25.     To resolve the legal and factual questions raised by Roche and to afford relief from the uncertainty and controversy which Roche's accusations have precipitated, Nova is entitled to a declaratory judgment that it does not infringe the claims of the '146 or '147 patents.

## SECOND COUNTERCLAIM

### Declaratory Relief Regarding Invalidity

26.     Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

27.     The claims of the '146 and '147 patents are invalid for failure to comply with the conditions for patentability specified in 35 U.S.C. § 101, *et seq.*, including, without limitation, the requirements in 35 U.S.C. §§ 102, 103 and 112.

28.     To resolve the legal and factual questions raised by Roche and to afford relief from the uncertainty and controversy which Roche's accusations have precipitated, Nova is entitled to a declaratory judgment that the claims of the '146 and '147 patents are invalid.

## THIRD COUNTERCLAIM

### Patent Infringement

29.     Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

30.     On information and belief, Roche has been and is infringing the '229 Patent by making, using, selling or offering for sale in the United States, including within this District, electrochemical sensors, including those sold under the trade name Accu-Chek® Aviva.

31.     Roche's infringement has been, and continues to be, knowing, intentional and willful.

32.     Nova has no adequate remedy at law.

33.    Roche's infringing activities have caused substantial damage to Nova. Unless enjoined by this Court, upon information and belief, Roche will continue its infringing activities and will continue to damage Nova and cause irreparable harm.

## FOURTH COUNTERCLAIM

### Breach of Contract

34.    Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

35.    Roche's use of Nova's proprietary Information to develop its own blood glucose monitoring strips constitutes a breach of Paragraph 3 of the Agreement.

36.    Nova has sustained damages as a result of Roche's breach and, on information and belief, will continue to sustain damages and suffer irreparable harm unless Roche is enjoined by this Court.

## FIFTH COUNTERCLAIM

### Misappropriation Of Trade Secrets

37.    Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

38.    Upon information and belief, Roche acquired proprietary and trade secret information from Nova under circumstances giving rise to a legal duty to maintain that information's secrecy, and not improperly use that information to Roche's benefit.

39.    Upon information and belief, Roche misused Nova's proprietary and trade secret information in the development of its own blood glucose test strips without express or implied consent from Nova.

40.     Nova has sustained damages as a result of Roche's improper use of Nova's proprietary and trade secret information and, on information and belief, will continue to sustain damages and suffer irreparable harm unless Roche is enjoined by this Court.

## SIXTH COUNTERCLAIM

### Unfair Competition

41.     Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

42.     Roche's improper use of Nova's confidential and proprietary information has inhibited Nova's ability to realize returns on its investment in innovation, research and development and impeded Nova's ability to earn revenue.  On information and belief, such damage will continue and cause irreparable harm unless Roche is enjoined by this Court.

## SEVENTH COUNTERCLAIM

### Conversion

43.     Nova repeats and realleges the allegations contained in Paragraphs 1-22 of its Counterclaims as if set forth fully herein.

44.     Nova had a property right in the confidential and proprietary information obtained by Roche from Nova.

45.     On information and belief, Roche exercised dominion over such information in a manner that was inconsistent with Nova's rights and interests to maintain the information as confidential and proprietary.

46.     Nova has sustained damages as a result of Roche's actions and, on information and belief, will continue to sustain damage and suffer irreparable harm unless Roche is enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Nova respectfully requests that this Court:

A.      Dismiss with prejudice the Amended Complaint and each and every count contained therein;

B.      Determine and declare that the claims of the '146 patent are invalid;

C.      Determine and declare that the claims of the '146 patent are not infringed;

D.      Determine and declare that the claims of the '146 patent are unenforceable;

E.      Determine and declare that the claims of the '147 patent are invalid;

F.      Determine and declare that the claims of the '147 patent are not infringed;

G.      Determine and declare that the claims of the '147 patent are unenforceable;

H.      Determine and declare that Roche infringes the claims of the '229 patent;

I.      Enjoin Roche from continuing to infringe the claims of the '229 patent;

J.      Award Nova damages sufficient to compensate it for Roche's infringement, with interest, and treble such damages as a result of Roche's willful infringement;

K.      Order that this case is exceptional pursuant to 35 U.S.C. § 285, and award Nova its reasonable attorneys' fees incurred in this action;

L.      Determine that Roche's actions constitute one or more breaches of the Agreement;

M.      Award Nova damages sufficient to compensate it for Roche's breach(es) of the Agreement;

N.      Enjoin Roche from continuing its actions in breach of the Agreement and causing irreparable harm to Nova;

16

O.    Determine that Roche's actions constitute misappropriation of trade secrets;

P.    Award Nova damages sufficient to compensate it for Roche's misappropriation of Nova's trade secrets;

Q.    Enjoin Roche from continuing its actions and causing irreparable harm to Nova;

R.    Determine that Roche's actions constitute unfair competition;

S.    Award Nova damages sufficient to compensate it for Roche's unfair competition;

T.    Enjoin Roche from continuing its unfair competition and causing irreparable harm to Nova;

U.    Determine that Roche's actions constitute conversion of Nova's information;

V.    Award Nova damages sufficient to compensate it for Roche's conversion of Nova's confidential and proprietary information;

W.    Enjoin Roche from continuing its actions and causing irreparable harm to Nova; and

X.    Grant such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

For all issues in Nova's Counterclaims that are triable by a jury, Nova demands a trial by jury pursuant to Rule 38(b), FED. R. CIV. P.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
*Attorneys for Defendant*
*Nova Biomedical Corporation*

OF COUNSEL:

Bradford J. Badke
Sona De
Michael P. Kahn
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036-8704

May 5, 2008
2312868

## <u>CERTIFICATE OF SERVICE</u>

I, Rodger D. Smith II, hereby certify that on May 5, 2008, I caused the foregoing

to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification

of such filing to the following:

> Philip A. Rovner, Esquire
> Potter Anderson & Corroon LLP
>
> Frederick L. Cottrell, III, Esquire
> Richards Layton & Finger PA
>
> Mary W. Bourke, Esquire
> Connolly Bove Lodge & Hutz LLP
>
> Steven J. Balick, Esquire
> Ashby & Geddes
>
> John W. Shaw, Esquire
> Young Conaway Stargatt & Taylor LLP

I also certify that copies were caused to be served on May 5, 2008, upon the

following in the manner indicated:

### <u>BY HAND AND EMAIL</u>

Philip A. Rovner, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19801

Frederick L. Cottrell, III, Esquire
Richards Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, DE  19801

Mary W. Bourke, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801

Steven J. Balick, Esquire
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899

John W. Shaw, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801


**BY EMAIL**

Daniel A. Boehnen, Esquire
Grantland G. Drutchas, Esquire
McDonnell Boehnen Hulbert & Bergoff LLP
300 South Wacker Drive
Chicago, IL  60606
boehnen@mbhb.com
drutchas@mbhb.com

Michael G. Adams, Esquire
Ashley L. Ellis, Esquire
Parker Poe Adams & Bernstein LLP
Three Wachovia Center, Suite 3000
401 South Tryon Street
Charlotte, NC  28202
mikeadams@parkerpoe.com
ashleyellis@parkerpoe.com

Edward A. Mas II, Esquire
McAndrews, Held & Malloy, Ltd.
500 West Madison Street
Chicago, IL  60661
emas@mcandrews-ip.com

Rachel Krevans, Esquire
Wesley E. Overson, Esquire
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105
rkrevans@mofo.com
woverson@mofo.com

Kenneth P. George
Joseph M. Casino
Amster Rothstein & Ebenstein LLP
90 Park Avenue
New York, NY  10016
kgeorge@arelaw.com
jcasino@arelaw.com


*/s/ Rodger D. Smith II*
Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
(302) 658-9200
rsmith@mnat.com

EXHIBIT A

# Agreement

F. HOFFMANN-LA ROCHE LTD, Grenzacherstrasse 124, CH-4070 Basel, Switzerland (hereinafter called "ROCHE")

and

NOVA BIOMEDICAL, Waltham, USA (hereinafter called "NOVA")

---

WHEREAS, NOVA has developed and possesses certain proprietary information relating to a

**new glucose monitoring technology**
(hereinafter called "Information");

WHEREAS, ROCHE desires to obtain access to such Information for the purpose of evaluating ROCHE's interest therein;

WHEREAS, NOVA is willing to disclose to ROCHE said Information for evaluation and determination of ROCHE's interest therein;

NOW, THEREFORE, the parties hereto agree as follows:

1. NOVA will, after execution of this Agreement by both parties, provide ROCHE with the Information.

2. The Information will be disclosed to ROCHE with the express understanding that neither ROCHE nor NOVA will be obligated to enter into any further agreement relating to Information. In addition, nothing in this Agreement shall be construed as granting any license or right in and to Information to ROCHE.

3. It is understood that such Information is proprietary to NOVA and ROCHE will treat such Information for a period of five (5) years after execution of this Agreement in the same manner as it would treat its own proprietary information and will not divulge the Information to third parties or use any Information for any other purpose than its evaluation except as follows:

   a) to the extent such Information is public knowledge or after disclosure hereunder becomes public knowledge through no fault of ROCHE; or

b) to the extent such Information can be shown by the party receiving the Information to have been in its possession or control prior to the date of disclosure hereunder; or

c) to the extent such Information is made available to the party receiving the Information from any third party without any obligation to the party disclosing the Information; or

d) to the extent the party receiving the Information can establish subsequent to the disclosure by the disclosing party that such Information was independently developed by the party receiving the Information without recourse to Information disclosed hereunder.

Affiliated companies of ROCHE as well as consultants of ROCHE are not considered third parties in the meaning of Art. 3, provided they assume the same secrecy obligations and are therefore bound to the secrecy obligations of ROCHE. However, the term "Affiliated Company" shall not include Genentech Inc., 1 DNA Way, South San Francisco, CA 94080-4990, U.S.A.

4. The parties will advise each other within three (3) months from the date of the disclosure of Information hereunder whether they are interested in negotiating a further agreement. Should the parties not be interested in negotiating a further agreement, all Information disclosed to each other under this Agreement shall be returned to the party having disclosed the Information, if so requested by such party, except that one copy may be kept for archive purposes.

5. It is agreed and understood that any Information in oral form disclosed to the party receiving the Information hereunder will not be subject to the terms hereof unless reduced to writing within ninety (90) days after the disclosure by the party disclosing the Information and such writing be given to the party receiving the Information within such ninety (90) day period.

6. This Agreement shall be governed in all respects by the laws of Switzerland.

Basel, this _Sept 8, 1999_

F. HOFFMANN-LA ROCHE LTD

ppa A. Maurer

Waltham, this _Sept 8, 1999_

NOVA BIOMEDICAL

Manganaro

EXHIBIT B



(12) **United States Patent**

Winarta et al.

(10) Patent No.: **US 6,258,229 B1**

(45) Date of Patent: **Jul. 10, 2001**

(54) **DISPOSABLE SUB-MICROLITER VOLUME SENSOR AND METHOD OF MAKING**

(76) Inventors: **Handani Winarta**, 18 Hyacinth Dr., Nashua, NH (US) 03062; **Xiaohua Cai**, 19 McCulloch St., Needham, MA (US) 02494; **Fung Seto**, 31 Pratt Dr., Newton, MA (US) 02465; **Chung Chang Young**, 145 Buckskin Dr., Weston, MA (US) 02193

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/324,493**

(22) Filed: **Jun. 2, 1999**

(51) Int. Cl.$^7$ ............................. G01N 27/26; A61B 5/08; H02B 13/00

(52) U.S. Cl. ........................ **204/403**; 204/412; 427/2.13; 216/13

(58) Field of Search ..................................... 204/400, 403, 204/412, 416, 431, 280, 286; 422/82.01, 88.02, 82.03; 324/439; 427/2.13; 216/13

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,897,173 | 1/1990 | Nankai et al. . |
| 5,120,420 | 6/1992 | Nankai et al. . |
| 5,232,856 * | 8/1993 | Firth ................................... 435/285.2 |
| 5,264,103 | 11/1993 | Yoshioka et al. . |
| 5,266,179 | 11/1993 | Nankai et al. . |
| 5,288,636 | 2/1994 | Pollman et al. . |
| 5,382,346 | 1/1995 | Uenoyama et al. . |
| 5,395,504 | 3/1995 | Saurer et al. . |
| 5,437,999 * | 8/1995 | Diebold et al. ................... 435/287.9 |
| 5,496,453 | 3/1996 | Uenoyama et al. . |
| 5,508,171 | 4/1996 | Walling et al. . |
| 5,509,410 | 4/1996 | Hill et al. . |
| 5,563,067 * | 10/1996 | Sugihara et al. .................. 435/287.1 |
| 5,628,890 | 5/1997 | Carter et al. . |
| 5,670,031 * | 9/1997 | Hintsche et al. .................... 204/412 |
| 5,682,884 | 11/1997 | Hill et al. . |
| 5,708,247 | 1/1998 | McAleer et al. . |
| 5,755,953 | 5/1998 | Henning et al. . |
| 5,759,364 | 6/1998 | Charlton et al. . |
| 5,762,770 | 6/1998 | Pritchard et al. . |
| 6,004,441 * | 12/1999 | Fujiwara et al. .................... 204/412 |

OTHER PUBLICATIONS

CAPLUS abstract of Jezkova et al. ("stabilization of an osmium bis–bipyridyl polymer–modified carbon paste amperometric glucose biosensor using polyethyleneimine", Electroanalysis (1997), 9(13), 978–984), Month Unknown.*

WO 98/35225 PCT Application, Aug. 13, 1998, Adam Heller et al.

WO 98/55856 PCT Application, Dec. 10, 1998, Stephen Williams et al.

* cited by examiner

*Primary Examiner*—T. Tung
*Assistant Examiner*—Alex Noguerola
(74) *Attorney, Agent, or Firm*—Robert R. Deleault, Esq.; Mesmer & Deleault, PLLC

(57) **ABSTRACT**

A disposable electrode strip for testing a fluid sample including a laminated strip with a first and second end, a vent, an open path for receiving a fluid sample of less than one microliter beginning from the first end and connecting to the vent, a working electrode, a reference electrode and a pseudo-working electrode embedded in the laminated strip within the open path and proximate to the first end, a reagent matrix coextensive within the open path and covering the three electrodes, and conductive contacts located at the second end of the laminated strip.

**38 Claims, 6 Drawing Sheets**





**Fig. 1**



**Fig. 2**



Fig. 3



**Fig. 4 A**



**Fig. 4 B**



**Fig. 4 C**



**Fig. 4 D**

VOLUME STUDY



**Fig. 5**



**Fig. 6**

1

# DISPOSABLE SUB-MICROLITER VOLUME SENSOR AND METHOD OF MAKING

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to electrochemical sensors that can be used for the quantification of a specific component or analyte in a liquid sample. Particularly, this invention relates to a new and improved electrochemical sensor and to a new and improved method of fabricating electrochemical sensors. More particularly, this invention relates to a disposable electrochemical sensor that is inexpensive to manufacture. Even more particularly, this invention relates to a disposable electrochemical sensor that gives accurate readings and requires only about 0.2 microliter of fluid sample. Still even more particularly, this invention relates to disposable electrochemical sensors which are used for performing electrochemical assays for the accurate determination of analytes in physiological fluids.

### 2. Description of the Prior Art

Biosensors have been used in the determination of concentrations of various analytes in fluids for more than three decades. Of particular interest is the measurement of blood glucose. It is well known that the concentration of blood glucose is extremely important for maintaining homeostasis. Products that measure fluctuations in a person's blood sugar, or glucose levels, have become everyday necessities for many of the nation's millions of diabetics. Because this disorder can cause dangerous anomalies in blood chemistry and is believed to be a contributor to vision loss and kidney failure, most diabetics need to test themselves periodically and adjust their glucose level accordingly, usually with insulin injections. If the concentration of blood glucose is below the normal range, patients can suffer from unconsciousness and lowered blood pressure which may even result in death. If the blood glucose concentration is higher than the normal range, the excess blood glucose can result in synthesis of fatty acids and cholesterol, and in diabetics, coma. Thus, the measurement of blood glucose levels has become a daily necessity for diabetic individuals who control their level of blood glucose by insulin therapy.

Patients who are insulin dependent are instructed by doctors to check their blood-sugar levels as often as four times a day. To accommodate a normal life style to the need of frequent monitoring of glucose levels, home blood glucose testing was made available with the development of reagent strips for whole blood testing.

One type of blood glucose biosensors is an enzyme electrode combined with a mediator compound which shuttles electrons between the enzyme and the electrode resulting in a measurable current signal when glucose is present. The most commonly used mediators are potassium ferricyanide, ferrocene and its derivatives, as well as other metal-complexes. Many sensors based on this second type of electrode have been disclosed. Examples of this type of device are disclosed in the following patents.

U.S. Pat. No. 5,628,890 (1997, Carter et al.) discloses an electrode strip having an electrode support, a reference or counter electrode disposed on the support, a working electrode spaced from the reference or counter electrode on the support, a covering layer defining an enclosed space over the reference and working electrodes and having an aperture for receiving a sample into the enclosed space, and a plurality of mesh layers interposed in the enclosed space between the covering layer and the support. The covering layer has a sample application aperture spaced from the electrodes. The

2

working electrode includes an enzyme capable of catalyzing a reaction involving a substrate for the enzyme and a mediator capable of transferring electrons between the enzyme-catalyzed reaction and the working electrode.

This device proposes to reduce the effect of hematocrit on the sensor readings. According to the disclosure, this results from the downstream spacing of the reference electrode relative to the working electrode in combination with the thin layer of the sample solution created by the mesh layers.

U.S. Pat. No. 5,708,247 (1998, McAleer et al.) discloses a disposable glucose test strip having a substrate, a reference electrode, a working electrode, and a means for making an electrical connection. The working electrode has a conductive base layer and a coating layer disposed over the conductive base layer. The coating layer is a filler having both hydrophobic and hydrophilic surface regions which form a network, an enzyme and a mediator.

U.S. Pat. No. 5,682,884 (1997, Hill et al.) discloses a strip electrode with screen printing. The strip has an elongated support which includes a first and second conductor each extending along the support. An active electrode, positioned to contact the liquid mixture and the first conductor, has a deposit of an enzyme capable of catalyzing a reaction and an electron mediator. A reference electrode is positioned to contact the mixture and the second conductor.

U.S. Pat. No. 5,759,364 (1998, Charlton et al.) discloses an electrochemical biosensor having an insulating base plate bearing an electrode on its surface which reacts with an analyte to produce mobile electrons. The base plate is mated with a lid of deformable material which has a concave area surrounded by a flat surface so that when mated to the base plate there is formed a capillary space into which a fluid test sample can be drawn. The side of the lid facing the base is coated with a polymeric material which serves to bond the lid to the base plate and to increase the hydrophilic nature of the capillary space.

U.S. Pat. No. 5,762,770 (1998, Pritchard et al.) discloses an electrochemical biosensor test strip that has a minimum volume blood sample requirement of about 9 microliters. The test strip has a working and counter electrodes that are substantially the same size and made of the same electrically conducting material placed on a first insulating substrate. Overlaying the electrodes is a second insulating substrate which includes a cutout portion that forms a reagent well. The cutout portion exposes a smaller area of the counter electrode than the working electrode. A reagent for analysis of an analyte substantially covers the exposed areas of the working and counter electrodes in the reagent well. Overlaying the reagent well and affixed to the second insulating substrate is a spreading mesh that is impregnated with a surfactant.

U.S. Pat. No. 5,755,953 (1998, Henning et al.) discloses a reduced-interference biosensor. The device generally comprises an electrode used to electrochemically measure the concentration of an analyte of interest in a solution. The device includes a peroxidase enzyme covalently bound to microparticle carbon and retained in a matrix in intimate contact with the electrode. According to this disclosure, it is the enzyme/microparticle carbon of the device which provides a composition which is displays little sensitivity to known interfering substances.

U.S. Pat. No. 5,120,420 (1992, Nankai et al.) discloses a biosensor with a base board having an electrode system mainly made of carbon, an insulating layer, a reaction layer containing an enzyme layer thereon, a spacer and a cover. The spacer creates a channel with an inlet and an outlet for holding a sample.

3                                                          4

PCT Patent Application No. WO 98/35225 (1998, Heller et al.) discloses a sensor designed to determine the amount and concentration of an analyte in a sample having a volume of less than about one microliter. The sensor has facing working and reference electrodes with an optional sorbent spacer. The working electrode is coated with a reagent layer containing a non-leachable redox mediator and an enzyme. This device, which is capable of using a test sample volume of less than 1 microliter, requires the use of a sorbent material within the sample chamber in order to reduce the volume requirement and to introduce a hydrophilic character to the chamber in order for the sample to flow into such chamber.

However, most of the remaining prior art devices require a test sample volume of greater than 2 microliters. This volume of test sample can only be obtained from a patient, for example, using a needle and syringe, or by lancing a portion of the skin such as the fingertip and "milking" the area to obtain a useful sample volume. These procedures are inconvenient for the patient, and often painful, particularly when frequent samples are required. Less painful methods for obtaining a sample are known such as lancing the arm or thigh, which have a lower nerve ending density. However, lancing the body in the arm or thigh typically produces submicroliter sample volumes of blood because these areas are not heavily supplied with near-surface capillary blood vessels. Because the present invention requires as little as 0.2 microliters of blood, patients who must make several blood glucose measurements a day may obtain blood samples from these preferred areas.

Additional shortcomings of the prior art devices are that they have a more limited linear range, usually up to about 600 mg/dL. Further, they require a relatively longer waiting time for development of a steady-state response before a reading can be achieved.

Because of the importance of obtaining accurate glucose readings, it would be highly desirable to develop a reliable and user-friendly electrochemical sensor which does not have all of the drawbacks mentioned above. Therefore what is needed is an electrochemical sensor which requires less sample volume than previously required by the prior art. What is further needed is an electrochemical sensor which has a wide linear measurement range; that is, a sensor useable over a wider glucose concentration. What is still further needed is an electrochemical sensor which has a relatively short wait time for development of a steady-state response.

SUMMARY OF THE INVENTION

It is an object of the present invention to provide an improved electrochemical sensor which combines an enzyme and a mediator. It is a further object of the present invention to provide an electrochemical sensor which requires less sample volume than previously required by the prior art. It is still another object of the present invention to provide an electrochemical sensor which can measure a small volume of sample without the use of a mesh layer in the sample path. It is yet another object of the present invention to provide an electrochemical sensor which has a wide linear measurement range and a relatively short wait time for development of a steady-state response.

The present invention achieves these and other objectives by providing an electrochemical sensor which requires a sample size of only about 0.2 microliters and does not use a mesh layer in the sample path as a means of achieving a reduced size of the sample. Further the present invention uses a reagent composition which allows readings, which correlate very closely to the analyte concentration in the fluid sample, to be taken 20 seconds after the fluid sample enters the sample channel. The present invention has a laminated, elongated body having a sample fluid channel connected between an opening on one end of the laminated body and a vent hole spaced from the opening. The sample fluid channel is sized to optimize the quick flow of a sample such as whole blood into the channel. The rapid uptake of the sample allows the electrode reactions to reach steady-state faster, thus resulting in obtaining an analyte reading more quickly. Within the fluid channel lies at least one working electrode and a reference electrode, preferably a working electrode, a reference electrode and a pseudo-working electrode. The arrangement of the working electrode and the reference electrode is not important for purposes of the results obtained from the electrochemical sensor. The working electrode, the reference electrode and the pseudo-working electrode are each in electrical contact with separate conductive conduits, respectively. The separate conductive conduits terminate and are exposed for making an electrical connection to a reading device on the end opposite the open channel end of the laminated body.

The laminated body has a base insulating layer made from a plastic material. The base insulating layer has a conductive layer on one side. The conductive layer may be deposited on the insulating layer by screen printing, by vapor deposition, or by any method that provides for a conductive layer which adheres to the base insulating layer and substantially covers all of the base insulating layer. The vapor-deposited conductive layer is separated into conductive conduits by etching/scribing the conductive layer. The etching process may be accomplished chemically, by mechanically scribing lines in the conductive layer, by using a laser to scribe the conductive layer into separate conductive conduits, or by any means that will cause a break between and among the separate conductive conduits required by the present invention. The preferred conductive coatings are gold film or a tin oxide/gold film composition/layer.

It should be pointed out that the gold film or tin oxide/gold film itself cannot function as a reference electrode. To make the reference electrode work, there must be a redox reaction (e.g., $Fe(CN)_6^{3-}+e^- \rightarrow Fe(CN)_6^{4-}$) at the electrically conducting material when a potential is applied. Therefore, a redox mediator must be present at the conducting material used for the reference electrode.

The unique feature of the present invention is its ability to measure sample sizes as small as 0.15 microliters without using opposing working and reference electrodes and a sorbent/mesh layer therebetween to reduce the required sample volume for measurement. This is possible because of the combination of material used for the base insulating layer with conductive coating, and the unique method of forming the conductive conduits thereon.

The laminated body also has a middle insulating layer on top of the base layer. The middle layer is also made of a plastic insulating material and creates the sample fluid channel of the laminated body. It contains a U-shaped cutout on one end which overlays the electrode portion of the conductive conduits on the base layer with the open end corresponding to the open end of the laminated body described earlier.

The thickness of the middle layer must be of sufficient thickness for loading a sufficient amount of chemical reagent for use as an electrochemical sensor while maintaining a flow-channel dimension having optimum blood flow char-

**5**

acteristics. The U-shaped cutout contains chemical reagent. The chemical reagent has a redox mediator with at least one of a stabilizer, a binder, a surfactant, a buffer, and an enzyme capable of catalyzing a reaction involving a substrate for the enzyme. The redox mediator is capable of transferring electrons between the enzyme-catalyzed reaction and the working electrode. It also makes the reference electrode function.

The laminated body of the present invention has a top layer with a vent opening. The vent opening is located such that at least a portion of the vent opening overlays the bottom of the U-shaped cutout exposing a portion of the chemical reagent of the middle insulating layer. The vent allows air within the sample fluid channel to escape as the sample fluid enters the open end of the laminated body. The sample fluid generally fills the sample fluid channel by capillary action. In small volume situations, the extent of capillary action is dependent on the hydrophobic/hydrophilic nature of the surfaces in contact with the fluid undergoing capillary action. This is also known as the wetability of the material. Capillary forces are enhanced by either using a hydrophilic insulating material to form the top layer, or by coating at least a portion of one side of a hydrophobic insulating material with a hydrophilic substance in the area of the top layer that faces the sample fluid channel between the open end of the laminated body and the vent opening of the top layer. It should be understood that an entire side of the top layer may be coated with the hydrophilic substance and then bonded to the second middle layer.

The three layers of the laminated body may be made from any dielectric material. The preferred material is a plastic material. Examples of acceptable compositions for use as the dielectric material are polyvinyl chloride, polycarbonate, polysulfone, nylon, polyurethane, cellulose nitrate, cellulose propionate, cellulose acetate, cellulose acetate butyrate, polyester, acrylic, and polystyrene.

The electrode portions, located within the sample fluid channel, contain reagent material for the working electrode (W), the reference electrode (R) and the pseudo-working electrode ($W_0$). A reagent mix is disposed into the fluid channel thus covering the electrode portions of the base insulating layer and the conductive conduits. A sufficient amount of reagent mix is deposited within the U-shaped cutout of the middle insulating layer to substantially cover all of the conductive surface delineated by the U-shaped cutout. The amount of the reagent mix used is such that the reagent matrix created upon drying is sufficient for use as an electrochemical sensor yet provides enough empty space above the reagent matrix to allow rapid blood flow through the fluid channel. The reagent matrix has a redox mediator with at least one of a stabilizer, a binder, a surfactant, a buffer, and an enzyme capable of catalyzing a reaction involving a substrate for the enzyme.

The possible electrode arrangements within the sample fluid channel may be $W$-$R$-$W_0$, $W$-$W_0$-$R$, $R$-$W$-$W_0$, $R$-$W_0$-$W$, $W_0$-$W$-$R$ or $W_0$-$R$-$W$ with the arrangement listed as the arrangement of electrodes would appear from the open end of the laminated body to the vent opening. The preferred position was found to be $R$-$W$-$W_0$; that is, as the sample fluid entered the open end of the laminated body, the fluid would cover R first, then W, then $W_0$.

The pseudo-working electrode, $W_0$, is positioned so that the sample fluid reaches it last. The resulting current at $W_0$ thus triggers the reading meter to start the measurement and analyte concentration determination process. Such an arrangement obviates reliability and accuracy problems due

**6**

to an insufficient sample fluid size. It should be pointed out that $W_0$ can also be used as a counter electrode. The resulting three-electrode system (i.e. working electrode, reference electrode and counter electrode) would be used in the case of a sample fluid having a large IR drop. It should also be pointed out that $W_0$, combined with R, can be used to measure the resistance of the sample fluid. The resulting resistance could be used to estimate the hematocrit of a blood sample and therefore to correct the hematocrit interference.

All of the advantages of the present invention will be made clearer upon review of the detailed description, drawings and appended claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the present invention showing the open end, the vent and the electrical contact points of the laminated body.

FIG. 2 is an exploded, perspective view of the present invention showing the various layers of the laminated body.

FIGS. 3 is a cross-sectional view of the present invention of FIG. 1

FIGS. 4A, 4B and 4C are top views of a segment of a strip of each layer of the present invention showing the patterns for making multiple sensors of the present invention.

FIG. 4D is a top view of a segment of the laminated strip of the present invention showing the patterns for making multiple sensors of the present invention.

FIG. 5 is a correlation of sample volume on the concentration response of the present invention.

FIG. 6 is a correlation curve of the concentration readings using sensors of the present invention versus the concentration readings of obtained on the same samples using a YSI glucose analyzer.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The preferred embodiment of the present invention is illustrated in FIGS. 1–6. FIG. 1 shows a sensor 10 of the present invention. Sensor 10 has a laminated body 100, a fluid sampling end 110, an electrical contact end 120, and a vent opening 42. Fluid sampling end 110 includes a sample fluid channel 112 between a sampling end aperture 114 and vent opening 42. Electrical contact end 120 has three discreet conductive contacts 122, 123 and 124.

Referring now to FIG. 2, laminated body 100 is composed of a base insulating layer 20, a middle layer 30, and a top layer 40. All layers are made of a dielectric material, preferably plastic. Examples of a preferred dielectric material are polyvinyl chloride, polycarbonate, polysulfone, nylon, polyurethane, cellulose nitrate, cellulose propionate, cellulose acetate, cellulose acetate butyrate, polyester, acrylic and polystyrene. Base insulating layer 20 has a conductive layer 21 on which is delineated a first conductive conduit 22, a second conductive conduit 23 and a third conductive conduit 24. Conductive conduits 22, 23 and 24 may be formed by scribing or scoring the conductive layer 21 as illustrated in FIG. 2 and shown as scribe line 27 and 28 or by silk-screening the conductive conduits 22, 23 and 24 onto base layer 20. Scribing or scoring of conductive layer 21 may be done by mechanically scribing the conductive layer 21 sufficiently to create the three independent conductive conduits 22, 23 and 24. The preferred scribing or scoring method of the present invention is done by using a carbon dioxide ($CO_2$) laser, a YAG laser or an eximer laser.

7

An additional scoring line 29 (enlarged and not to scale; for illustrative purposes only) may be made, but is not necessary to the functionality of sensor 10, along the outer edge of base layer 20 in order to avoid potential static problems which could give rise to a noisy signal. Conductive layer 21 may be made of any electrically conductive material, preferably gold or tin oxide/gold. A useable material for base layer 20 is a tin oxide/gold polyester film (Cat. No. FM-1) or a gold polyester film (Cat. No. FM-2) sold by Courtaulds Performance Films, Canoga Park, Calif.

Middle layer 30 has a U-shaped channel cutout 32 located at middle layer sensor end 31. The length of channel cutout 32 is such that when middle layer 30 is layered on top of base layer 20, electrode areas W, R and $W_0$ are within the space defined by channel cutout 32. The thickness of middle layer 30 was found to be critical for the speed of the sample fluid flow into sample fluid channel 112, which is filled by capillary action of the sample fluid. Channel cutout 32 holds the reagent matrix 50, more clearly shown in FIG. 3, forming the working electrode, the reference electrode and the pseudo-working electrode. Typically, the reagent matrix 50 must be loaded with a redox mediator to make the reference electrode function. If R is not loaded with a redox reagent or mediator, working electrode W and $W_0$ will not work. Electrode areas W, $W_0$ and R are loaded preferably with the same chemical reagent. The reagents preferably contain an oxidized form of a redox mediator, a stabilizer, a binder, a surfactant, a buffer, and an enzyme. Typically, the redox mediator may be at least one of ferrocene, potassium ferricyanide, other ferrocene derivatives, or other organic and inorganic redox mediators. The preferred stabilizer is polyethylene glycol, the preferred binder is methyl cellulose, the preferred surfactant is t-octylphenoxypolyethoxyethanol, and the preferred buffer is a citrate buffer. The enzyme is capable of catalyzing a reaction involving a substrate for the enzyme or a substrate catalytically reactive with an enzyme and a mediator capable of transferring electrons transferred between the enzyme-catalyzed reaction and the working electrode to create a current representative of the activity of the enzyme or substrate and representative of the compound. An example of such an enzyme is glucose oxidase.

Top layer 40, which is placed over and coextensive with middle layer 30, has a vent opening 42 spaced from fluid sample end 110 of sensor 10 to insure that sample fluid in fluid channel 112 will completely cover electrode areas W, R and $W_0$. Vent opening 42 is placed in top layer 40 so that it will align somewhat with the bottom of channel cutout 32 of middle layer 30, the bottom meaning the channel cutout 32 located furthest from sensor end 31. Preferably, vent opening 42 will expose a portion of and partially overlay the bottom of the U-shaped cutout 32 of middle layer 30. FIG. 3 shows an enlarged cross-sectional view of the various layers of the present invention. The layers are not to scale in order that the relationship of each component of the present invention may be better understood by those skilled in the art, especially scribe lines 27 and 28.

### Preparation of Electrode Reagent Matrix

The electrode reagent matrix comprises the oxidized form of a redox mediator, a stabilizer, a binder, a surfactant, a buffer, and an enzyme. The oxidized form of the redox mediator, potassium ferricyanide, was found to be stable in the matrix. Suitable potassium ferricyanide is available from Sigma Chemical, St. Louis, Mo. (Cat. No P3667). The quantity used in the formulation must be sufficient to attain a workable linear range. The enzyme must also have suffi-

8

cient activity, purity and stability. A commercially available glucose oxidase may be obtained from Biozyme, San Diego, Calif. as Cat. No. G03A, about 270 U/mg. The stabilizer must be sufficiently water-soluble and be capable of stabilizing both the mediator and the enzyme. The preferred stabilizer is polyethylene glycol (Cat. No. P4338, Sigma Chemicals, St. Louis, Mo.). The binder should be capable of binding all other chemicals in the reagent matrix in electrode areas W, R and $W_0$ to the conductive surface/layer 21 of base layer 20. The preferred binder is Methocel 60 HG (Cat. No. 64655, Fluka Chemical, Milwaukee, Wis.). The buffer solution must have sufficient buffer capacity and pH value to optimize the enzyme reaction. A 0.05 M citrate buffer is preferred. Citric acid and sodium citrate used in making the citrate buffer may be obtained from Sigma Chemical. The surfactant is necessary to facilitate dispensing of the electrode reaction matrix into channel cutout 32 as well as for quickly dissolving the dry chemical reagents involved in forming the reagent matrix. The amount and type of surfactant is selected to assure the previously mentioned functions and to avoid a denaturing effect on the enzyme. The preferred surfactant is Triton X-100 available from Fluka Chemical, Milwaukee, Wis. (Cat. No. 94443). The reagent matrix is obtained by preparing a reagent mix as follows:

Step 1: Prepare 50 mM citrate buffer (pH 5.7) by dissolving 0.1512 grams citric acid and 1.2580 grams sodium citrate in 100 ml of deionized water.

Step 2: Prepare a 1% methocel 60 HG solution by stirring 1 gram of methocel in 100 ml of citrate buffer from Step 1 for 12 hours.

Step 3: Add 0.3 ml of 10% Triton X-100 into the methocel solution.

Step 4: Add 2.5 grams of polyethylene glycol into the solution from Step 3.

Step 5: While stirring, add 6.5 grams potassium ferricyanide to the solution of Step 4.

Step 6: Add 1.0 gram of glucose oxidase to the solution of Step 5 and stir for 10 minutes or until all solid materials are completely dissolved.

### Electrode Construction

A piece of a gold or tin oxide/gold polyester film available from Courtaulds Performance Films is cut to shape, as illustrated in FIG. 2, forming base layer 20 of sensor 10. A $CO_2$ laser is used to score the gold or tin oxide/gold polyester film (25 W laser available from Synrad, Inc., San Diego, Calif.). As illustrated in FIG. 2, the film is scored by the laser creating scoring line 27 and 28 such that two electrodes at sample fluid end 110 and three contact points 122, 123 and 124 were formed at electrical contact end 120. The scoring line is very thin but sufficient to create two separate electrical conductors. An additional scoring line 29 made be made, but is not necessary, along the outer edge of base layer 20 to avoid potential static problems which could cause a noisy signal from the finished sensor 10.

A piece of double-sided tape (Arcare® 7840) available from Adhesive Research, Glen Rock, Pa., is cut to size and shape forming middle layer 30 with U-shaped channel 32 so that it will cover a majority of the conductive layer 21 of base layer 20 except for exposing a small electrical contact area at electrical contact end 120 illustrated in FIG. 1. The U-shaped channel 32 is cut by using the $CO_2$ laser. Middle layer 30 is then layered onto base layer 20. As mentioned earlier, this middle layer 30 serves as a spacer and defines the size of the fluid sample channel 112. It also defines the electrode area 26 which holds the electrode reagent matrix 50. Its width and length is optimized to provide for a

9

10

relatively quick moving fluid sample. The preferred size of U-shaped channel **32** is about 0.039 in. (1.0 mm) wide by about 0.134 in. (3.4 mm) long.

1.0 microliters of reagent mix is dispensed into channel **32** to form electrodes W, R and $W_0$. The reagent mix is a mixture of a redox mediator, a stabilizer, a binder, a surfactant, a buffer, and an enzyme. The preferred composition for the reagent mix is made by mixing the following percentages (W/W%) of the following ingredients: about 6.5% potassium ferricyanide, about 2.5% polyethylene glycol, about 1% methocel 60 HG, about 0.03% Triton X-100, about 0.05 M citrate buffer (pH 5.7), and about 1% glucose oxidase. After the addition of the reagent mix, the device was dried in an oven at 55° C. for about 2 minutes.

After drying, a piece of a transparency film (Cat. No. PP2200 or PP2500 available from 3 M) is fashioned into top layer **40**. A rectangular vent hole **42** is made using the $CO_2$ laser previously mentioned. The preferred size of vent hole **42** is about 0.039 in. (1.0 mm) by about 0.051 in. (1.30 mm). Vent hole **42** is located approximately 0.087 in. (2.2 mm) from fluid end **110** of sensor **10**. Top layer **40** is aligned and layered onto middle layer **30** to complete the assembly, as illustrated in FIG. **1**, of sensor **10**.

Although the description of electrode construction above describes construction for a single sensor, the design and materials used are ideal for making multiple sensors from one piece of each layer material as shown in FIGS. **4A**–**4C**. This is accomplished by starting with a relative large piece of base layer **20** having conducting layer **21** thereon. A plurality of scored lines **27** and **28** are made into conductive layer **21** such that a repetitive pattern, as illustrated in FIG. **4A**, is created using the preferred scribing method described previously whereby each pattern will eventually define the three conductive paths **22**, **23** and **24** for each sensor. Similarly, a large piece of middle layer **30** having a plurality of elongated cutouts **32** in a repetitive pattern and illustrated in FIG. **4B** is layered onto base layer **20**. The large piece of middle layer **30** is sized to fit over base layer **20** in such that the plurality of elongated cutouts **32** are aligned over the areas where the scribe lines **27** and **28** intersect exposing three distinct electrode areas W, R and $W_0$, and exposing the plurality of conductive contacts **122**, **123** and **124** located at the opposite edge of the strip. The size of each cutout and the amount of reagent mix disposed in each channel **32** are similar to that disclosed above. After dispensing the reagent mix into the respective cutouts, the reagent mix is dried such that each elongated cutout **32** of middle layer **30** contains a thin layer of the reagent matrix. A top layer **40** comparably-sized to and coextensive with middle layer **30** having a plurality of vent openings **42** in a repetitive pattern, as shown in FIG. **4C**, is layered onto middle layer **30**. FIG. **4D** is a top view of the combined layers. The laminated strip created by the three layers **20**, **30** and **40** has a plurality of sensors **10** that can be cut from the laminated strip. The laminated strip is cut longitudinally along line A–A' at fluid sampling end **210** to form a plurality of sampling apertures **114** and longitudinally along line B–B' at electrical contact end **220** to form a plurality of conductive contacts **122**, **123** and **124**. The laminated strip is cut at predetermined intervals along lines C–C' forming a plurality of individual sensors **10**. Shaping of the fluid sampling end **120** of each sensor **10**, as illustrated in FIG. **1**, may be performed if desired. It should be understood by those skilled in the art that the order in which the laminated strip can be cut is not important. For instance, the laminated strip may be cut at the predetermined intervals (C–C') and then the cuts along A–A' and B–B' can be made to complete the process.

The following examples illustrate the unique features of the present invention. All sensors of the present invention were tested on a breadboard glucose meter manufactured by Nova Biomedical Corporation of Waltham, Mass. A potential of 0.35 Volts was applied across the working electrode and the reference electrode and the resultant current signals were converted to glucose concentrations. The readings were compared to readings (control readings) obtained on the same samples using a YSI Glucose Analyzer (Model 2300) available from Yellow Springs Instruments, Inc., Yellow Springs, Ohio.

## EXAMPLE 1

### Demonstration of Minimum Sample Volumes Feature

The unique design of the present invention enables the measurement of sample sizes smaller than which have heretofore been possible. Blood samples are applied to the sensors and the samples travel along the fluid sample channel to the venting hole. The blood volume required for measurement of blood glucose is determined by the channel volume. The calculated volume for the present invention is 0.22 microliters. In order to test the volume effect on sensor response, different blood sample volumes were applied to the sensors and the resulting concentration readings were plotted against volume. The test data is shown in FIG. **5**.

Sensors of the present invention show no dependence of the response on the sample volume down to a volume of less than 0.22 microliters. It was found that sensors of the present invention still gave reasonable readings on sample sizes as low as 0.15 microliters. This is possible because the hydrophilic character of the Reagent Matrix applied to W, R and $W_0$ permitted the sample to cover the electrode areas even though the blood volume did not fill the entire sample channel.

## EXAMPLE 2

### Demonstration of Wide Linear Range and Precision Feature

A sample of venous blood was collected and separated into several aliquots. Each aliquot was spiked with different glucose concentrations ranging from 35 to 1000 mg/dL. The aliquots were each measured with a YSI glucose analyzer and then with sensors of the present invention using the Nova glucose meter. Sensors of the present invention show a linear relationship of current response vs. glucose concentration from 35 to 1000 mg/dL. The concentration readings were plotted against the concentration values obtained using the YSI meter (the control) and are illustrated in FIG. **6**.

A regression coefficient of 0.9976 indicated a near perfect match with the readings obtained with the YSI blood glucose analyzer. The same aliquots were tested using four different commercially-available sensors with their accompanying meters. The commercially-available sensors showed a linear response only up to about 600 mg/dL. Above the 500–600 mg/dL range, all commercially available sensors displayed "Hi" as the test result.

The precision of the sensors of the present invention was investigated at the same glucose level range from about 35 to 1000 mg/dL. Four different batches of sensors of the present invention were used in the precision tests. Typically, the relative standard deviation was about 5.0% and 3.6% for samples containing 100 and 300 mg/dL levels of glucose, respectively.

11

What is claimed is:

1. A disposable electrode strip for testing a fluid sample comprising:

a laminated strip having a first strip end, a second strip end and a vent opening spaced from said first strip end, said laminated strip comprising a base layer having a conductive layer disposed thereon, said conductive layer having a scribe line delineated thereon and forming three electrode paths, a channel forming layer carried on said base layer, and a cover;

an enclosed channel between said first strip end and said vent opening, said enclosed channel sized to hold a volume of said fluid sample less than one microliter;

a reagent matrix containing at least an enzyme; a stabilizer, wherein said stabilizer is a polyalkylene glycol; and a redox mediator disposed on said base layer in said enclosed channel;

conductive contacts at said second strip end and insulated from said enclosed channel.

2. The electrode strip of claim 1 wherein said enzyme is glucose oxidase.

3. The electrode strip of claim 1 wherein said redox mediator is at least one metal complex.

4. The electrode strip of claim 3 wherein said redox mediator is at least one of potassium ferricyanide or other inorganic or organic redox mediators.

5. The electrode strip of claim 1 wherein said conductive coating is gold.

6. The electrode strip of claim 1 wherein said conductive coating comprising gold and tin oxide.

7. The electrode strip of claim 1 wherein said base layer, said channel forming layer and said cover are made of a plastic dielectric material.

8. The electrode strip of claim 1 wherein said enclosed channel is hydrophilic.

9. The electrode strip of claim 1 wherein said enclosed channel has a volume of about 0.22 microliters.

10. The electrode strip of claim 1 wherein said cover has a hydrophilic coating on at least one side.

11. The electrode strip of claim 1 wherein said reagent matrix further contains at least one of, a binder, a surfactant, and a buffer.

12. The electrode strip of claim 11 wherein, said binder is a cellulose material, and said surfactant is a polyoxyethylene ether.

13. The electrode strip of claim 12 wherein said stabilizer is polyethylene glycol, said binder is methyl cellulose, said surfactant is t-octylphenoxypolyethoxyethanol, and said buffer is a citrate buffer.

14. The electrode strip of claim 13 wherein said reagent matrix is made from a mixture having starting components comprising about 1 wt % to about 6.5 wt % of said redox mediator, about 2.5 wt % of said stabilizer, about 1 wt % of said binder, about 0.03 wt % of said surfactant, and about 1 wt % of said enzyme in said citrate buffer.

15. The electrode strip of claim 14 wherein said citrate buffer is about 0.05 M.

16. The electrode strip of claim 14 wherein said potassium ferricyanide is 6.5 wt %.

17. The electrode strip of claim 14 wherein said enzyme is glucose oxidase.

18. The electrode strip of claim 1 wherein said channel forming layer thickness sufficient to optimize the flow of said fluid sample along said open path.

19. The electrode strip of claim 18 wherein said thickness is about 0.0035 inches (0.089 mm).

20. The electrode strip of claim 1 wherein said enclosed channel contains a working electrode, a pseudo-working electrode and a reference electrode.

12

21. The electrode strip of claim 20 wherein said pseudo-working electrode is a counter electrode.

22. The electrode strip of claim 20 wherein said pseudo-working electrode is a triggering electrode.

23. The electrode strip of claim 20 wherein said pseudo-working electrode and said reference electrode pair are a resistance-measuring electrode pair.

24. The electrode strip of claim 1 wherein said stabilizer is polyethylene glycol.

25. A disposable electrode strip for detecting or measuring the concentration of an analyte in a fluid sample, said electrode strip comprising:

an insulating base strip having a first base end and a second base end;

a conductive layer disposed on one side of said base strip, said conductive layer having a pattern scribed into said conductive layer, said pattern delineating three electrically-distinct conductive paths insulated from each other;

a middle insulator sized smaller than said insulating base strip and overlaying a substantial portion of said conductive layer, said middle insulator having a cutout portion spaced from said first base end, said cutout portion exposing a limited area of said three conductive paths;

an electrode material comprising an enzyme, a redox mediator; a stabilizer, wherein said stabilizer is a polyalkylene glycol, a binder, a surfactant, and a buffer, said electrode material being disposed in said cutout portion; and

a covering insulator sized to fit over and be coextensive with said middle insulator creating a sample fluid channel, said covering insulator having a covering insulator aperture spaced from said first base end and configured to expose at least a small portion of said cutout portion of said middle insulator.

26. The strip of claim 25 wherein said sample fluid channel has a volume of about 0.22 microliters.

27. The strip of claim 25 wherein said sample fluid channel is hydrophilic.

28. The strip of claim 25 wherein said redox mediator is at least one metal complex selected from the group consisting of ferrocene, ferrocene derivatives and potassium ferricyanide, said stabilizer is a polyalkylene glycol, said binder is a cellulose material, said surfactant is a polyoxyethylene ether, and said buffer has a pH of about 5 to about 6.

29. The strip of claim 28 wherein said mediator is potassium ferricyanide, said stabilizer is polyethylene glycol, said binder is methyl cellulose, said surfactant is t-octylphenoxypolyethoxyethanol, and said buffer is a citrate buffer.

30. The strip of claim 29 wherein said electrode material is made of a mixture having starting components comprising about 6.5 wt % of said potassium ferricyanide, about 2.5 wt % of said polyethylene glycol, about 1 wt % of said methyl cellulose, and about 0.03 wt % of said t-octylphenoxypolyethoxyethanol, and about 1 wt % of said enzyme in said citrate buffer.

31. The strip of claim 30 wherein said enzyme is glucose oxidase.

32. The electrode strip of claim 25 wherein said sample fluid channel contains a working electrode, a pseudo-working electrode and a reference electrode.

33. The electrode strip of claim 32 wherein said pseudo-working electrode is a counter electrode.

**13**

**34**. The electrode strip of claim **32** wherein said pseudo-working electrode is a triggering electrode.

**35**. The electrode strip of claim **32** wherein said pseudo-working electrode and said reference electrode pair are a resistance-measuring electrode pair.

**36**. A method of making multiple, disposable sensors wherein each sensor has at least a working electrode, a reference electrode, a pseudo-working electrode, and a reagent matrix, wherein said reagent matrix contains an enzyme capable of catalyzing a reaction involving a sub-strate for the enzyme, said working electrode and said reference electrode being disposed in a fluid sample channel for measuring a fluid sample, said method comprising:

obtaining a base strip of an insulating material having a layer of conductive material disposed thereon, said base strip having a first edge and a second edge;

scribing in said conductive material a plurality of lines in a repetitive pattern wherein said plurality of lines contain a repetitive pattern capable of forming three conductive paths in each of said repetitive pattern;

disposing a middle layer of insulating material over said base strip, said middle layer having a repetitive pattern of an elongated cutout wherein each cutout of each of said repetitive pattern exposes an electrode portion of each of said three conductive paths of each repetitive pattern wherein said repetitive pattern of said elongated cutout are spaced from said first edge of said base strip, and wherein said middle layer is sized to expose a contact portion of each of said two conductive paths of each repetitive pattern for a distance from said second edge of said base strip;

**14**

disposing an reagent material, wherein said reagent mate-rial contains a polyalkylene glycol stabilizer, into each elongated cutout of said repetitive pattern;

drying said reagent material at a temperature and for a length of time sufficient to solidify said reagent mate-rial in each of said elongated cutout;

disposing a top layer of insulating material over and coextensive with said middle layer, said top layer having a plurality of vent openings in a repetitive pattern wherein each of said vent openings exposes a portion of a corresponding repetitive pattern of said elongated cutout of said middle layer furthest from said first edge of said base strip, said base strip, said middle layer and said top layer forming a laminated strip;

cutting along and parallel to said first edge of said laminated strip a predetermined distance creating a sample inlet port in each of said elongated cutout for each of said repetitive pattern;

cutting along and parallel to said second edge of said laminated strip a predetermined distance creating two separate contacts for each of said repetitive pattern; and

separating each of said repetitive pattern at predetermined intervals along said laminated strip.

**37**. The method of claim **36** wherein said drying step further includes heating said reagent material at a tempera-ture of about 55° C.

**38**. The method of claim **37** wherein said drying step further includes heating said reagent material for about two minutes.

* * * * *